[1] Reported in 184 P.2d 255.
SIMPSON and MILLARD, JJ., dissent in part.
After the En Banc hearing of this cause on June 18, 1947, an opinion was prepared by Mr. Justice Simpson which failed to secure the approval of the majority of the eight judges who heard the argument, but, as is clearly indicated by the record, solely because of a paragraph therein which expressly overruled a former decision of this court in the case of In re Denison's Estate,23 Wn.2d 699, 162 P.2d 245.
The case has been reassigned to me by the chief justice for the preparation of another opinion. Upon a consideration of the matter, I have concluded that I can in no way improve on the opinion heretofore prepared by Mr. Justice Simpson. I, therefore — with the exception of the paragraph above referred to — adopt it in its entirety, and, as set down in the following pages, submit it to the members *Page 839 
of the court for their concurrence or dissent, to be indicated on the final page thereof.
July 30, 1945, Allan O. Knutsen, the son of Mrs. Alida Torstensen, filed his petition in contest of the will of his mother. The basis of his contention was that she was not of sound and disposing mind and memory at the time she executed her will; that, at that time and for many years prior thereto, she was afflicted with hallucinations and insane delusions; further, that during that time she was unable to comprehend the nature of her business which she was transacting, the extent of her property, or the natural objects of her bounty.
After a long trial was had, during which time over forty witnesses, including her attorney, R.W. Miller, testified, the trial court entered its decree denying the petition.
The petitioner, Allan O. Knutsen, in appealing to this court, assigns as error the action of the trial court in finding that the decedent had testamentary capacity to make a will on November 24, 1944.
[1] We deem it necessary, in order to make plain our reasons for the decision in this case, to set forth the pertinent, undisputed facts, and the testimony of several witnesses. In so doing, we have in mind the following rules:
"A person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. This is the standard by which courts must measure the facts of each case in which it is contended that an instrument offered or accepted as the will of a decedent was executed at a time when the testator lacked capacity to make a valid testamentary disposition of his property." In re Bottger's Estate, 14 Wn.2d 676,129 P.2d 518.
[2] The law presumes testamentary capacity of the maker of a will which is rational on its face. In order to *Page 840 
set aside a will, it is necessary that the evidence be cogent and convincing. In re Schaefer's Estate, 8 Wn.2d 517,113 P.2d 41.
[3] Unless hallucinations and delusions are related to the provisions of the will, they are not material. It must be established by the evidence that the will was a creature of delusions or hallucinations. In re Miller's Estate, 10 Wn.2d 258, 116 P.2d 526.
[4] Of course, the proof does not have to be direct in order to prove that the hallucinations and delusions affected the making of the will. Circumstantial evidence may supply the proof, and, if the evidence as a whole shows that a testator did not know the extent of his property, nor the natural objects of his bounty, then his will cannot be sustained.
Mrs. Torstensen was born September 30, 1866. At one time, she was married to Oscar Knutsen. Two children were born to that marriage, Mabel Knutsen Guss and Allan O. Knutsen. They lived in Charleston, now a part of Bremerton. Mr. Knutsen worked in the navy yard and later built a hotel at 220 Burwell street in Bremerton. In 1905, Knutsen went to North Dakota and purchased a farm. Allan went to North Dakota to be with his father. He stayed there only a few months, and then went to live with his grandparents in Minnesota, afterwards returning to North Dakota in 1907 or 1908. Mabel went to North Dakota in 1907 or 1908 and lived with her father. The three visited the A.Y.P. Exposition in 1909 but did not see Mrs. Knutsen. She took a trip to North Dakota in 1911 but returned to Bremerton after a visit of two weeks. The Knutsens were divorced either in 1913 or 1914. Mrs. Torstensen operated a hotel or rooming house in Bremerton. Allan saw his mother for the last time in 1912. After serving in World War I, Allan became ill, and asked his mother for a loan, which was refused. He then wrote the following letter to her:
"Mrs. A. Thorensen, Chicago, Ill. "Bremerton, Wash. Feb. 8, 22.
"I am writting this letter in order that you might know *Page 841 
that I am once more enjoying fair health, working and doing very nicely. I am writting this letter to you as it seems only proper that I should occasionally although I find no pleasure in doing so and do not care now or at any other time to hear from you . ..
"You have lost everything that a woman and mother has to loose namely the respect of your children, the love of your husband your own repu[t]ation and what not.
"I am writting as I am in order that you will get it out of your head once and for all times that I ever expect anything from you.
"You are a very queer woman to say the least but nevertheless you are my mother and for that reason only I shall write occasionally and let you know of my whereabouts.
"There was a time two years ago that I was willing to do any thing to get you out of the hell that you are living in and would have tried to forget all the misery you have caused me, and if there's a God in heaven you will have to suffer for your dammable sins and for your evil intentions even toward your own daughter. . . .
". . . it hurts me beyond words to know that I have a mother of your type, and am ashamed to ever say to people from out there who I come in contact with that I used to live there myself and that my mother still lives there for fear that they might know you.
"This letter should dispell from your disalusioned [illusioned] mind the idea that I ever expect or want any thing from you. Your money is tainted and could only bring sorrow.
"Mable, Dad and I have lived clean and honest and today are succes[s]ful and happy while you are paying for your evil ways and nigeradly [niggardly] deed as is only proper.
"I have made this letter as strong as possible so that in order that you might know exactly how I feel toward you.
"As ever your Son Allan."
Later he wrote another letter, a portion of which read:
"I don't blame you for refusing me money when I was going to school in Chicago, but I am convinced that you no longer love me or my family. This is a matter of life and death and you refused me. I will never again write you."
Allan is married and has three children. He has never been in jail nor was he ever arrested. Mabel Knutsen Guss has a family and lives in Santa Ana, California. The record *Page 842 
does not disclose how she and her mother got along. However, it does appear that they corresponded to a limited extent. At one time, Mrs. Torstensen visited her daughter's home, but her conduct was such that the visit was never repeated.
November 24, 1944, Mrs. Torstensen executed her will, which had been prepared by attorney R.W. Miller. The witnesses to the will were R.W. Miller and his wife, Orilla Miller. January 4, 1945, Mabel Guss filed a petition to have a guardian appointed of the person and estate of her mother. Upon that date, the court entered an order authorizing E.W. Schweer to place Mrs. Torstensen in a medical institution, and "to see that she has suitable medical care." January 22, 1945, attorney R.W. Miller, filed a petition similar to that of Mrs. Guss. On the same day, the court entered an order declaring Mrs. Torstensen to be incompetent and appointed E.W. Schweer as her guardian. Mrs. Torstensen was taken to a hospital, but, because of her conduct, it was found impossible to keep her there. January 8, 1945, upon the petition of Andrew Hilland, Mrs. Torstensen was found to be insane and committed to the Northern State Hospital for the insane. The examining physicians were Drs. E.C. Gross and H.E. Wilson. Mrs. Torstensen died in the asylum January 23, 1945. The certificate of the hospital authorities stated that the cause of death was broncho-pneumonia. Her will was admitted to probate February 2, 1945, and the appointment of R.W. Miller, as executor, was confirmed. The appraised value of the estate is $237,465.53.
Mr. S.B. Lent, who had lived in Bremerton since 1904, and had known Mrs. Torstensen since 1914, testified that he met her on the street in October or November of 1944. She was with an old gentleman who was leading her, "and every once in awhile, she stopped to take a rest." When she saw the witness, she said, "You are Mr. Lent, aren't you?" and he answered, "Yes." She was very excitable in her talk — kept repeating things over and over. He testified further that she talked about her sickness, rambled fast with her talk, and was very excited. Her speech was entirely *Page 843 
different from what it had been on previous occasions. He concluded that she looked "a little mentally gone in a way."
Edgar Vinge, a nephew of Mrs. Torstensen, had seen her frequently during the five years preceding the trial, the last time being in April, 1944. Prior to October, 1944, he had been on very friendly terms with Mrs. Torstensen. At that time when he went to see her, she would not let him in the house — told him to leave — she didn't want to see him. In April of that year when he talked to her, she said that Allan was no good because "he had costed her a bit of money — getting him out of jail."
Honorable John M. Ralston, judge of the superior court for Clallam and Jefferson counties, testified in this case. He sat as judge in the trial of a case on November 2, 1944, in which case the O.P.A. had sued Mrs. Torstensen for rent overcharge. The judge made the following statement:
"A. Well, during that trial, which I think lasted about a day, as I remember it, the defendant was on the stand and she appeared to me to be just a frail, elderly person, confused in a great many ways and it is my opinion at that time, if there had been an application for guardianship of her property, I certainly would have appointed a guardian for her. Q. Would you describe, Judge, just what the nature of her speech and testimony was? A. It is pretty hard to remember that, particularly, only that she was considerably confused and didn't seem to me to have any judgment as to her own business interests. Her attorney, Mr. Miller, was kind and patient with her and I think Mr. Merkel appeared for the plaintiff in that case, if I remember correctly, and everyone was patient with her. I know, particularly, an O.P.A officer testified, here, and he tried to get her to register her property and so forth and he seemed to be very patient, too. Q. Then, I think that in your oral summarization of the case — in your oral opinion, do you remember saying: `I think the court would find on all general principles in this case, that this defendant should never be allowed to do business by herself. I would find she is incompetent if she were before me to appoint a guardian. She is just an agitator against her own business interests.' . . . *Page 844 
"Q. Then, let me ask, as a result of your observations of Mrs. Torstensen, of her speech, conduct and behavior at that trial, have you formed an opinion of her, relative to her capacity to form a will? A. Yes. Q. What is your opinion? A. That she would not be in a mental condition at that time to make a will."
Allan Pitt, an officer in charge of the Salvation Army in Bremerton, had known Mrs. Torstensen for about two years, and had seen her about a half dozen times in 1944. He told of a conversation he had with her during the latter part of the year; stated that her conversation was of a rambling nature, and at times, incoherent, and that "she acted in any but what you would call an absolutely sane manner." In another portion of his testimony he said:
"A. I would say Mrs. Torstensen was not mentally stable. . . . I say that on the grounds that any time I talked with the old lady during that last period of her life on earth and when she appeared on the street, that her manner of speech was anything but that of a stabilized mentally, individual."
Alma Highland, the wife of Mrs. Torstensen's first cousin, had known the old lady for twenty-three years, and saw her in the middle part of November, 1944. At that time, Mrs. Torstensen didn't know the witness, and talked to her as if she were a perfect stranger, and asked her to leave the room. She testified further:
"Q. Well, would you just state what you observed? A. She was a little mentally disturbed and there was a little mental condition there. Q. Upon what do you base that? What was said? What happened? A. I, well, I think her mind would go blank or something. She would forget, so far as I can describe it."
Arthur M. Highland, a son of the last witness, had seen Mrs. Torstensen over a period of several years. He had visited with her eight or nine times during 1944. About four or five of these occasions were in the last six months of the year. At one time Mrs. Torstensen ordered the witness's father out of the room in which they were talking, handed the witness some bank books and deeds, but did not give him *Page 845 
a chance to look at any of them because she took them back immediately. She mentioned the fact that she wanted the father of the witness to be one of the administrators of her estate, but that now he was too old and deaf. The witness said that "she didn't seem to terminate any subject that she started — at least, I couldn't tell what she was getting at." Again, he stated that he could not converse with her intelligently. He had visited her in July or August of that year. He knocked at the door but got no response. He then went to the window and tapped on it, at which time she lifted the blind and told him "to get the hell out of there."
Marie Thurnes had known Mrs. Torstensen for twenty years and owned an apartment house within two and one-half blocks of where she lived. The witness was not well acquainted with Mrs. Torstensen, but during the middle part of August, 1944, the old lady stopped her as she was going by and asked her to come into the house. Mrs. Thurnes entered the house and found the room to be in very poor condition. Mrs. Torstensen told her that she was giving a big birthday party and invited her to be a guest. Mrs. Torstensen also told the witness that she had sold nineteen places over at Seattle, and that she had received some dividend checks from the power company. The witness said, "Well, you are well-fixed, Mrs. Torstensen," and received the answer, "My money don't do me any good. I take care of my daughter's children — keep them in a school, and it keeps me poor. I have to pay quite a bit out for their upkeep." (There was no evidence which showed that Mrs. Torstensen took care of her daughter's children or contributed to their education.) The witness said that Mrs. Torstensen "didn't seem like a woman that was talking like she had good sense."
Howard Young, general superintendent of plant No. 1, Isaacson's Iron Works, who lived in Seattle, had known Mrs. Torstensen during her lifetime and had acted as her adviser on many occasions. He had seen her approximately eighteen or twenty times during 1944. One of these occasions was in August of that year. His visit consumed about one and one-half hours. She was having some difficulty with *Page 846 
the city officials over the condition of the hotel she was managing. Mr. Young said that she was much perturbed and erratic; that he had never seen her in that frame of mind before. He saw about a dozen checks that dated back over a year previous, that she had not cashed. He saw her again on December 15th, and said that she had "slipped mentally, considerably, by then."
The testimony of J.A. Bernhardt, a deputy sheriff, given by way of deposition, was read into the record by Mr. Bryan, and showed that he had known Mrs. Torstensen for some time, and saw her on August 19, 1944. At that time, she told the witness that she was going to make a will and leave all of her property to him. When told that he didn't want the property, she said that he could sell it or take care of it. The witness stated that Mrs. Torstensen was rambling in her conversation "because she changed from one subject to another that had no connection," and that he "figured she was acting insane."
The deposition of Carrie Cantonwine, read into the record by Mr. Bryan, showed that the witness had known Mrs. Torstensen for about fifteen years. The last time she saw her was in May, 1942, in Bremerton. At that time, the old lady wouldn't eat. She thought everybody was trying to poison her. The witness also stated:
"She didn't seem to know me at times and at one time thought I was her sister and became angry when I talked to her about it, and said `What do you know about my sister,'; then she talked about her son, what a wonderful boy he was, what a wonderful job he had, nice family and children and at that time was put out with her daughter because of a letter received from her daughter advising her mother how to make her will; wasn't at all normal the way she had been in previous visits up there. This was in 1942."
Josephine Byers had known deceased since 1929, and saw her in September, 1944, when Mrs. Torstensen invited her into her apartment; that she wrote letters for the deceased some time after that in November. Mrs. Byers said that during the months of October and November, Mrs. Torstensen's *Page 847 
speech was rather incoherent; said she'd ramble off on something else; that she didn't stay right to the point and logically turn off to some other subject and talk about it. She said that Mrs. Torstensen did not recognize her at first when she called on her during the middle of October, 1944. In November, 1944, she spoke about her son Allen, saying that he was a fine man. Mrs. Byers also testified that she saw in the room occupied by Mrs. Torstensen, bonds in envelopes lying about. She had a teapot all full of money, and there were coins and bills in the room.
The next witness was Eva Sieler, who had known Mrs. Torstensen since 1933, and had visited with her in July, 1944, and every week or two thereafter until Mrs. Torstensen died. In 1942 or 1943, she was shown a will made by Mrs. Torstensen in which it was provided that her property should be divided equally between her children. She further testified that the last year Mrs. Torstensen spoke of her son occasionally, sometimes as a man, sometimes as a boy coming home from school; and that she never said anything but good of him. Mrs. Torstensen told the witness that she had lots of properties, but her main interest was in having it so that it would take care of her son so that he would have a place to go when he got out of the university. She mentioned fifteen or twenty pieces that she owned. Asked whether during the period from July to November, 1944, Mrs. Torstensen knew and recognized her, the witness said:
"Sometimes she would call me other people's names and other times she would ask me who I was, and she'd want to give me some clothes at different times and want me to take care of her clothes and keep them for her and different things like that, which would be unusual."
Mrs. Torstensen told the witness that she was afraid somebody would poison her, and that sometimes she would not eat the meals prepared for her, on that account.
Ralph A. Horr, member of the Seattle bar, was called as a witness for appellant. He had been acquainted with Mrs. Torstensen since 1930 or 1932, and had advised her in his *Page 848 
professional capacity several times. He drew a will for her in 1942. The witness said that in the will Mrs. Torstensen made a few minor bequests to some personal friends, some grandchildren, and then made an equal division between her daughter and son. He testified further that she signed the will, and that it was attested by two witnesses. He said that he considered her to have mental capacity at that time. In 1944 when Mrs. Torstensen had some difficulty with the city officials of Bremerton over the apartment house in which she was living, she consulted the witness in his Seattle office; subsequently he was induced to make a trip to Bremerton to assist her in negotiations with the city officials. Mr. Young, a witness in this case, accompanied Mr. Horr. This was in May or June. The witness told about a long conversation he had with Mrs. Torstensen, and about the negotiations with the city officials. Asked if he had any opinion as to her mental condition, he said:
"A. I certainly wouldn't believe she was in possession of her faculties at that time. Q. What would you say with regard to whether she had the requisite faculties to make a will at that time? A. I would not have drawn a will under those facts and circumstances. Q. All right, did you see her later? A. Yes. Q. And about when was that? A. I can't remember. It was after this incident. She came over and she had a whole list of people she wanted me to see, including the mayor, the city attorney, the building inspector, chief of police, I believe, and a couple of policeman she said that had been sticking their noses in her business. Q. You conferred with her in your office? A. Yes, and she said some people that lived across the road from her had been the cause of all of her trouble. They were running a dump and she wanted them incorporated into a suit and she was noisy and excitable and I got her out of the office and when she couldn't get me to bring suit, she left in a huff. I had to tell her candidly that I couldn't handle that kind of matter. Q. Did you arrive at a conclusion of her mental capacity? A. Oh, yes. The suit she wanted to bring was something that a person in her right mind wouldn't know about. In other words, she didn't know what she wanted a suit for."
The deposition of Mrs. Myrtle Knutsen, wife of the appellant, was read into the record by Mr. Bryan. In it she *Page 849 
stated that she had seen a letter signed by Mrs. Torstensen, addressed to Mabel Guss, dated sometime in the summer or fall of 1944; that the letter contained the following statement:
"I want Allen's address so that when I die the court can notify him that he will get what the little boy shot at. He caused me so much trouble and cost me $200.00 to get him out of jail."
Frances Gischer had known Mrs. Torstensen since August, 1941. She saw her on the twenty-third day of November, 1944. The witness said that Mrs. Torstensen was failing; that her mental condition was good.
Lee H. Brandenburg, assistant manager and teller of the Seattle-First National Bank, Bremerton branch, testified on behalf of respondents. He had known Mrs. Torstensen about eight years. He stated that, during all the years he had known her, she had made deposits in his bank at various times. When asked if he had formed any opinion as to her mental capacity the last time he saw her in the bank in November, 1944, the witness stated: "So far as I remember, there had been no change in the times I had waited on her — same as usual."
B.H. Allen, Bremerton plumber, testified that he saw Mrs. Torstensen about November 1, 1944, about a bill which she owed him for work done on some of her property. Asked about his opinion of her mental condition at that time, he said he couldn't see any change and would call her condition normal.
Viola Barlow, a bank teller, had known Mrs. Torstensen about twenty-five or thirty years and saw her frequently during the year 1944. The witness identified deposits made by Mrs. Torstensen during that year. The witness stated that it was the habit of Mrs. Torstensen to make out a separate deposit slip for each check she got from rents in order that she "could keep her rents straight." In speaking of Mrs. Torstensen's mental capacity as of November, 1944, the witness said she formed the opinion that she knew what she was doing. *Page 850 
Maurice J. Sullivan, a tavern operator in Bremerton, had known deceased for about ten years, during which time he saw her quite often. He stated that up to December 27, 1944, she was the same Mrs. Torstensen as she always was — "had her own mind."
Arnold Wang testified on behalf of respondents. Mr. Wang is in the real estate and insurance business in Bremerton; he had known Mrs. Torstensen for several years, during which time she had transacted business with him. He said that he had a conversation with her in December of 1944 when she was going across the street, and that she seemed to know what she was doing at that time. Asked if he formed an opinion as to her mental capacity to know who her children were, he said that it never occurred to him to think of anything like that. He assumed that she knew who her children were.
Andrew Hilland, who had known Mrs. Torstensen since 1890 or 1891, and lived in a cabin adjoining her property, testified that he had been working for her, running errands, and doing work around the apartment house; that he took care of her rented rooms, brought a portion of her meals to her from the restaurant, and did various odd jobs. When testifying as to his opinion of her mental condition during the last part of November, 1944, he said that he "knew she was all right"; she could take care of her business; that the first time he noticed that her mind was slipping was a week before Christmas of 1944.
Orilla Miller, the wife of R.W. Miller, the executor named in Mrs. Torstensen's will, testified that she saw Mrs. Torstensen on the twenty-fourth day of November. She went with her husband to see Mrs. Torstensen and, at that time, witnessed the will which is being contested in this action. Mrs. Torstensen asked her to sign as a witness, and she saw the old lady sign the will. She stated her opinion as to Mrs. Torstensen's mental condition at that time, thus: "Well, she was all right." The witness also testified that she had seen Mrs. Torstensen on many occasions, and that her (Mrs. Torstensen's) mind had not changed. The witness admitted *Page 851 
that she did not see Mrs. Torstensen read the will, and that it was not read to her.
C.C. Browning rented a house from the deceased and saw her in November, 1944. At that time, she gave him a letter to deliver to Mr. Miller, attorney. Mr. Browning was of the opinion that her mental condition was good. This conclusion was based upon the incidents just mentioned, and several others connected with the renting of the property.
Laura Berentsen rented a house from deceased June, 1944. The witness said that she delivered the rent to Mrs. Torstensen, the last time being the twentieth of November, 1944. At that time, they visited together all afternoon. The witness was requested by Mrs. Torstensen to make out a receipt for the rent, which she signed. During their visit, Mrs. Torstensen talked about many things; showed pictures of her grandchildren; and told about the old country. She also complained that she couldn't eat. When the witness left, she was invited to call again and was told that she, Mrs. Torstensen, was going to make a will and give everything she had to her daughter. The witness was of the opinion that the old lady was "all right" mentally.
Carrie Mae Browning, the wife of C.C. Browning, testified that she saw Mrs. Torstensen on November 14, 1944, that being the first and last time. The witness and her husband visited with Mrs. Torstensen in her apartment for about thirty minutes. Asked if she thought the deceased knew what properties she had, the witness said, "Why sure."
Hershel Pyle lived in one of the houses belonging to the Torstensen estate, having rented it on August 29, 1944. The day before, he visited with Mrs. Torstensen about thirty minutes, discussing the renting of the house. On the twenty-ninth he took her to the place. After that he saw her very often. He saw her the times he went to pay the rent. The last time he visited with her was on or about December 15th, at which time he talked with her about an old heater that was in the place he had rented. He stated, when questioned regarding her mental condition, that he *Page 852 
"didn't know anything wrong with her" — that she knew what property she had, and who her children were.
Mattie Pyle's testimony was similar to that given by her husband, Hershel Pyle.
M.G. McCloud, a building inspector in the city of Bremerton, had known Mrs. Torstensen about twenty years. He had occasion many times to have business transactions with her during the time he was city building inspector. He told about a visit he had with her one day in August, 1944, when he and the fire chief went to see her about the condition of her apartment house. Questioned as to whether she knew what properties she had, he said that she did and also knew who her relations were.
Rena Pappas had known Mrs. Torstensen since 1919. During that period of time, the husband of the witness operated a restaurant and an apartment house. Mrs. Torstensen used to visit the restaurant on many occasions, and also the Pappas home. Mrs. Pappas said Mrs. Torstensen called on her sometime around Thanksgiving of 1944; at that time Mrs. Torstensen was sick, but it was the opinion of Mrs. Pappas that she was perfectly normal in other ways, and that there was nothing wrong with her mind.
L. Hum Kean, mayor of Bremerton, saw Mrs. Torstensen in the fall of 1944, at which time they talked about the building regulations pertaining to the city of Bremerton. She came to the council room, which was also the mayor's office. A short time before, he had some conversation with her regarding the condemnation of one of her buildings, and the necessity for observing the building code. Asked if she discussed these matters intelligently, the witness said, "Yes." He was of the opinion that she had sufficient intelligence to transact business at that time.
Albert Abrahams had been acquainted with Mrs. Torstensen for about forty years, during which time he had bought property and made out legal papers for her. The last time he saw her was in November, 1944, at which time they talked about various business transactions. He was of the *Page 853 
opinion that she had the mentality to know what property she owned.
Fred W. Beck had known deceased since 1917 and saw her quite often during subsequent years, the last time being shortly after Thanksgiving of 1944, at which time, he met her on the street. At that time, she advised the witness to go to a soldiers' home. The witness said that he didn't see anything different in her conversation from any other time he had talked to her.
The next witness, Margaret Prestfeldt, had known Mrs. Torstensen for about three years. During that time, the witness, as an employee of the Wang Investment Company, took care of some business for Mrs. Torstensen, most of which related to insurance on Mrs. Torstensen's buildings. In October, 1944, they had a conversation concerning the insurance policies on two houses owned by Mrs. Torstensen. Questioned about the deceased's mental condition at that time, the witness said that she thought that Mrs. Torstensen knew what she was doing, knew who her children were, and was able to carry on and conduct business. The witness also said that Mrs. Torstensen knew how much fire insurance she was carrying without being told.
E.W. Schweer, an employee of the Puget Sound Power and Light Company, had known Mrs. Torstensen since 1920. As an employee of the company, he called upon her on several occasions and sold to her preferred stock of his company. He saw her many times during the year 1944, when he had other business transactions with her. He went to Seattle with her in May, 1944, to take care of the transfer of stock of the company for which the witness worked. He told about several financial transactions that she took part in on that day. He went to Seattle with her again on August 14th. At that time, she had the interest on her savings accounts brought down to date at the Seattle-First National Bank and the Puget Sound Savings and Loan Company. She also transferred one thousand dollars from her Bremerton savings account, which amount she invested in the Puget Sound Power and Light. He saw her again on November 27, 1944, and, when questioned as to *Page 854 
his opinion of her mental condition at that time, stated, "She was excellent." She knew who her children were; knew what property she owned, and was in the same mental condition that she had been during the time that he had known her. Mr. Schweer was afterwards appointed guardian of the person and estate of Mrs. Torstensen.
R.W. Miller testified on behalf of respondents. Mr. Miller is an attorney who has been practicing in Kitsap county since 1932. He had acted for Mrs. Torstensen on several occasions since he arrived in Bremerton. He testified that he saw her several times in 1944 and defended a case for her on November 2, 1944, which had been instituted by the O.P.A. Just prior to the date the case was to be tried, Mrs. Torstensen wanted to get a continuance because of her physical condition. The witness advised her to call on a doctor to get a certificate to the effect that she could not attend the trial. The doctor refused to give the certificate. Miller said that she asked him how she could avoid treble damages if the O.P.A. recovered, and he told her the only thing she could do was to make it appear that she didn't understand the regulations, and that no one even informed her as to what she had to do first pertaining to regulations, etcetera. He further told her:
"If the court was under the opinion that you didn't wilfully violate those regulations, he probably wouldn't inflict the penalty of treble damages."
The witness said that Mrs. Torstensen attended court, and that she impressed the court very well pertaining to her failure to understand. He said that he saw deceased twice a week through the month of November, during which time she asked him questions concerning the rentals of her property, and the making of a will. He further testified:
"Q. I will ask you whether or not you now have an opinion as to her mental condition during the whole of the month of November, 1944? A. I have. Q. I will ask you what that opinion is? A. It is good — just as good as it has ever been." *Page 855 
The witness admitted that he went to Seattle and contacted Mr. Horr relative to the will he had drawn for Mrs. Torstensen some years previous.
We deem it necessary, in order to show the intense interest Mr. Miller had in the success of this litigation, to set out a large part of his cross-examination:
"Q. I will ask you if she [Mrs. Torstensen] made answers to your questions under direct examination as follows: `Your name is Alida Torstensen and you are the defendant in this action brought by Mr. Draper for the recovery of rent payments?' Answer: `Yes.' Question: `Now, about the first of April, 1941, people by the name of George was in this property of yours at 403 South Lafayette.' Answer: `Yes, I guess they did.' Question: `They stayed in there for a few months after the 1st of April?' Answer: `I guess they did have the property.' Question: `They moved out shortly after that and what did you do for improvement of the property?' Answer: `It would take a long time to tell that — had it all repapered and plastered and put a lot of stuff in it — had to paper it through and through and paint the woodwork, and it was in awful condition. They have a farm. Mr. Pruitt used to be attorney — lived right across the street and he was repairing all the cars and the last time I heard, he was in Tacoma in jail and then the place is wrecked so bad. I had it all papered. I have had expenses — three or four hundred dollars; in the meantime, I had to have the plumber there several times. He always put some cement or lead on the pipes. And some boys used to keep up some old cars going, — ' Did she testify to that effect? A. I don't remember. Q. Doesn't that sound familiar to you? A. I don'tremember. Q. I can let you refresh your recollection. A. I can recall what answers she gave. I can recall she gave an account of some improvements upon the property and she was trying to impress the court with the justification of the charge because of these improvements. Q. I will ask you right out: Isn't it a fact that she testified that way in answer to that question? A. I don'tknow. I don't remember. I do remember of her stating about the improvements and so forth. Q. Is Mr. Pruitt an attorney? A. Idon't recall. . . .
"Q. I will see if I can refresh your memory on some of these other items. You remember that she answered she spent some $400 on the bathroom and she answered: `Kitchen, *Page 856 
and I repapered the walls in the dining room. He had to put an electric light in the kitchen and everything. I think it was $400 before I got this condition fixed. It is a five-room modern house, a block from the Navy Yard gate.' You remember that? A. I don't remember. It may have been something of the gist. I don'tjust recall how she answered it. Q. Isn't it a fact that that house on Lafayette is about four and a half blocks from the Navy Yard Gate? A. Pretty close to the Navy Yard. I don't know how far it is. It is close though. Q. In answer to your question: `How much furniture do you have,' — then the court stated: `Five pieces of overstuffed furniture?' The witness: `The bathroom — or the sink in the kitchen, also, — the water is dripping in it in the bathroom and running all the time and the two houses are on one meter — so I pay half and half water — it comes to 75 cents a month, apiece.' Question: `You say there are five pieces of overstuffed furniture. What was the value of that furniture?' Answer: `Quite a bit. I was in a private hospital. The doctor I had — I had three doctors, — ' The court: `How old are you now, girlie?' The witness: `Seventy. I don't like to tell you. Dr. Coyle told me I have a lump on my heart and I'm too old to have anything done and I'm too sick and I'm in pain all the time and I have a rupture and I raised a big family.' The court: `How many places do you take care of? How many houses do you rent?' The witness: `I rent four.' The court: `How many pieces of property do you own?' The witness: `No business property. You can't call it business property. I have no one to take care of it. I have one sweeper for the halls and stairs.' The court: `How much is your income from rent, a month — $100 or $500 a month?' The witness: `I've been getting pretty near $500 in bills and by the time the taxes are paid, — ' The court: `How much are you getting for rent a month?' The witness: `$25 for one and $30 for one and $40 for one and they are supposed to pay that but I have to try to get a chance to sell that property because my daughter needs money and I have been trying, — ' The court: `How much income do you receive for your business property?' The witness: `I have the place I am living in and three or four roomers. I don't recall it much — $3.50 a week. It doesn't even pay for the light and water and garbage. The garbage is $2.20. And I was back for five weeks in the hospital. I never been off the cot, up in the private hospital.' The court: `You have business property, — ' The witness: `Yes, I am very honest and truthful and fair. It *Page 857 
isn't as if I needed him but I sent for him.' The court: `I don't wish to ask any further questions.' Do you remember that? A. Yes, she referred to the rent on the business — the old hotel — the amounts she was getting — the money from the hotel — didn't amount to anything. Q. You remember the last question and answer: `You've been ill how long, Mrs. Torstensen, this last time?' Answer: `Three years — the last three years. I went to the Providence Hospital. I am a veteran's widow.' Did she testify to that? A. She might have. Well, I don't know. I know she wastrying to impress, — Q. I didn't ask you what she was trying to do. Did she testify to that? A. I don't remember. Q. As a matter of fact, you know; you tried the case; you examined her. A. I never looked at it. Q. Here it is. (Handing witness transcript of testimony) Why should you deny it? A. You don'tneed to give me that. You have given me the verbatim testimony. Ithink the gist of it was, she was trying to get it over to thecourt. . . .
"Q. Now, then, under cross examination by Mr. Merkel, isn't it true that the cross examination after a few preliminary questions, was that Mr. Merkel asked her: `Are you sure you got 403 plastered?' Answer: `I plastered back of the heating stove in 403.' Question: `Isn't it true that 403 behind the heating stove is the only place that got replastered?' Answer: `At that time, I don't know. The O.P.A. came in, and of course, I have been under doctors most of the time, and I have been in a private hospital — had three government doctors and three private nurses.' Question: `You say you had five pieces of furniture put in — do you mean, five pieces of overstuffed furniture? Answer: `I didn't tell that.' Question: `You didn't mean that?' Answer: `I didn't say that.' Question: `Do you recall what you put in?' Answer: `I put in all the stuff for renting it.' Question: `You didn't put in overstuffed furniture?' Answer: `I never said I did.' Question: `Do you recall what pieces of furniture you put in?' Answer: `Some chairs, a table and a Congoleum rug and heating stove and different things. I don't remember. I am seventy years old and I've been under a doctor's care. The Georges moved out of the house. They tore it up.' Question: `This house has been owned by you, how long?' Answer: `Not so awful long.' Question: `Both 403 and 405 South Lafayette houses were built during the last war?' Answer: `(No response)' Question: `Are those government houses?' Answer: `They were not government houses. They were built by Mr. *Page 858 
Duff, that owned a grocery store in Bremerton.' Question: `They are forty years old?' Answer: `I couldn't rent a house that old.' Is that the way she answered? A. I don't recall much in regardto the testimony. I only remember that she was a mighty goodwitness on the case.
"Q. Now, you remember that after Mr. Merkel — later on, that Mr. Merkel said: `Excuse me. You just rest, Mrs. Torstensen.' And the court said: `One question, more: I think you are pretty well recovered.' Question: `I want to ask you, do you still own that property down on 1st street of Patty Sullivan's?' Answer: `I own nothing but two houses — isn't that enough? I gave you all the information. The last four weeks, all this started in Mr. Draper's house and now it goes into another house. It all started with the Drapers. I never had such trouble, before.' Question: `Mrs. Torstensen, does anyone help you with your business?' Answer: `No, course not.' Question: `You are handling them all by yourself?' Answer: `I got nothing to handle. I got my daughter in California and I am sick and old and I had children — my daughter and son and we're all poor people.' Question: `Does Ralph Horr, attorney in Seattle, help you with some of your business?' Answer: `Go and ask him. Do you have any more you want to ask? I can't stand this, Mr. Miller.' (Witness excited) Mr. Miller: `Just take your time.' Mr. Merkel: `Just take time and rest. (Witness rests) Could I ask you two more questions about the property at 403 South Lafayette?' The witness: `God! Ask it and be done.' Question: `Now, you admit it is a fact that the Georges were paying you $20 a month in 1941, on April 1st.' Answer: `Well, for awhile — what year was that in?' Question: `1941.' Answer: `I tried to get them. You bad boy! (Breathing hard, again) I tried to get them out.' Mr. Merkel: `Don't tire yourself out. I just wondered if they paid you $20 a month, then?' Answer: `I tell you I got them out.' Question: `Then Mr. Draper was paying you $40 a month, all the time?' Answer: `He can tell you himself. He has receipts.' Question: `You gave receipts for the money he gave you?' Answer: `Yes.' Question: `Did you ever file a registration on that house, Mrs. Torstensen, with the O.P.A.?' Answer: `I did, one. I don't know. Can't remember. I've been in the hospital.' Question: `Did you ever petition to the O.P.A. to have the rent raised on Mr. Draper's house.' Answer: `I didn't have it raised.' Question: `You didn't petition to raise it from $20 to $40?' Answer: *Page 859 
`(No response)' Question: `When Mr. Draper was there, you said you rented it for $20 a month?' Answer: `That was years back when things was awful bad. Mr. Draper paid $20 a month and I was glad to get it to live on.' Question: `Places are scarce, now?' Answer: `Certainly. Places around there are renting for $60. Mine is modern and they both work in the Navy Yard and make a mint of money and I paid pretty near $500 in repairs. How long does it take to get rent out to pay for that four hundred or five hundred dollars plumbing bill — it just happened recently. I have nothing.' Question: `The building inspector told you the place on Burwell would have to be condemned?' Answer: `I paid pretty near $500 on my place and then there is taxes and insurance, besides I am not making a nickel. I want to get them out of there.' Question: `Are you going to give all your other property away to your children?' Answer: `I'll give it away. I don't want nothing. I tried the last three or four months, because I can't stand it. I asked the Georges to get out. I have a son in jail.'
"Did she testify to that? A. I don't know. I don't recallwhether she said she had a son in jail. I do know she was trying to impress the court that she didn't have anything and didn't understand in regard to rentals. Q. Now, you think this testimony was the testimony of a sane woman, Mr. Miller? A. Oh, yes, Ithink she did wonderfully in that case. Q. Did she testify as you had directed and advised her to testify? A. I told her ifthe court was under the impression that she knew about the O.P.A.regulations and wilfully violated them, that the court wouldprobably inflict the treble damages. Q. And you thought shetestified, then, the way you wanted her to? A. I think she cameout very good." (Italics ours.)
Dr. Elmer Gross was one of the doctors who examined Mrs. Torstensen at the time she was committed to the asylum for the insane. The doctor is a graduate of Johns Hopkins, took his internship in Seattle, and practiced there until 1939, and since that time, in Port Orchard. He testified that he had made an examination of Mrs. Torstensen on January 8, 1945, at which time she was quite irresponsible; that she was senile; had senile dementia which had developed over some long period of time. He testified that senile dementia doesn't come in a day and, from Mrs. *Page 860 
Torstensen's condition, would say that she was very senile, mentally, about a year — possible more than a year, but he couldn't state that any time previous to that she was absolutely irrational. He was of the opinion that on November 24, 1944, Mrs. Torstensen in all probability did not have sufficient mental capacity to comprehend generally the nature and extent of the property which constituted her estate. Asked, if, on November 24, 1944, she had sufficient mind and memory to comprehend the nature of the transactions for making a will, the doctor stated:
"Of course, as I said before, this wouldn't be positive. I wouldn't state positively, but I can state in all probability that she was not."
The witness further explained his conclusion as follows:
"A. As I said before, I think in all probability she was mentally irresponsible at that time and probably sometime previous to that, but in regard to recognizing people, I don't think that would weight in the balance one way or the other as to her mental capacity. She might be absolutely insane and still recognize people but she wouldn't be responsible for any obligations she had or those things but a person like that can, just on the spur of the moment — may recognize persons she had known, and just a little bit later, not know anything about it. That is the only explanation I can give to that. I couldn't say positively as to just what she might or might not recognize at that time. . . .
"A. As I said before, in my opinion, she wasn't in condition to recognize obligations or reasonable purposes at that time, although she might remember people as they came before her or remember names but still I would consider that she was, for any responsible procedure — she was incompetent."
Dr. E.A. Posell is a graduate of the Boston University School of Medicine. He specializes in psychiatry and has been associated with the Northern State Hospital at Sedro Woolley for about thirteen years, at which place he is at present the clinical director. On January 10, 1945, he examined Mrs. Torstensen. The testimony of the doctor may be summarized as follows: Mrs. Torstensen did not answer questions clearly and relevantly. She was confused. *Page 861 
Her memory was patchy. She made statements which were either delusions or jokingly delusional. She said that she was twenty-one, and that she was too young to get married. Asked about her husband, she first said he was alive, and the next moment that he was dead. She didn't recognize the doctor when he called the next day. He diagnosed her disease as that of senile psychosis, which is a gradual, continuous, and progressive disease. Asked, from his examination of her, how long before that time it had been that she lacked sufficient mind and memory generally to understand the nature and extent of her property, the doctor stated:
"Well, considering the condition of her when I saw her, the degree of intellectual incapacity and the general credibility of her mind, from my experience with these cases, I would say, although one can't be exact, that this condition existed to a degree — that she wouldn't know what her property was, and so forth — for at least a year — maybe more, before I saw her. Q. Now, assuming that the will in the case under contest was drawn on the 24th day of November, 1944, do you have an opinion, from your examination of this woman up at the hospital, as to whether or not on November 24th, 1944, she had sufficient mind and memory to understand the transactions of making a will? A. Oh, I would say she wouldn't have had at that time. Q. And I will ask you also, from your examination of this woman, whether you have reached an opinion as to whether or not on November 24th, 1944, she had sufficient mind and memory to independently recollect and know the objects of her bounty — by objects of her bounty, I mean, —
"MR. GARLAND: Don't let counsel explain. This witness is supposed to know something. I object to counsel testifying. MR. BRYAN: I will withdraw my explanation. MR. MILLER: The same objection runs to all this form of testimony. MR. BRYAN: If he wants to know what objects of bounty are, I will have to explain. First, I ask you what opinion, — MR. GARLAND: Of course, the same objection. THE COURT: Yes, objection overruled.
"A. I would say, `No,' that she wouldn't have the proper mental capacity to know the objects of her bounty. I assume that objects of her bounty means those who she is going to give her bounty to, — whatever she's got." *Page 862 
On cross-examination, he said that Mrs. Torstensen would not have the judgment to know what she was doing for approximately a year before. The doctor admitted that, if she had collected money from her tenants, and went directly to the bank, and put it in the bank correctly, kept her bank book and took it home, talked to people on the streets correctly, and recognized them, it was evident she would be competent when she was doing it.
Dr. Elmer Cornell testified that his records showed that May 21, 1942, Mrs. Torstensen came to his office with a badly infected hand which he considered quite severe, and wanted her to go to the hospital, but that she left his office. The office record showed the following:
"[Dated 5-21-42] Did not wait. Arm badly infected. Advised hospital. Patient got impatient and left before arrangements could be made. Stated we were trying to keep her a prisoner. Patient quite senile."
Dr. Harold Cornell, graduate of the Evangeline College of Medicine, and authorized to practice in the state of Washington, saw Mrs. Torstensen in November, 1944, at which time she wanted a certificate showing her inability to attend a trial that was to be had in court. The doctor said that, in his opinion, drawn from his examination made at that time, Mrs. Torstensen seemed to be normal.
Counsel for appellant has called our attention to the activities of attorney R.W. Miller, a witness and trial lawyer in this case. They argue little credit should be given to his testimony, in view of his interest in the outcome of this litigation and his violation of the legal code of ethics. Rem. Rev. Stat., § 139-14 [P.P.C. § 273-43] (11), and Rule XI (11), for the discipline of attorneys, 193 Wn. 92-a, provides an attorney or counselor may be reprimanded, suspended, or disbarred for violation of the ethics of the profession. The bar rule further provides that "the Code of Ethics of the American Bar Association shall be the standard of ethics for the members of the bar of this state." Rule XIX of the Code of Ethics of the American Bar Association provides when a lawyer is a witness for his client, *Page 863 
except as to merely formal matters, such as attestation, or custody of an instrument and the like, he shall leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his clients.
Mr. Miller had been Mrs. Torstensen's attorney for many years, and represented her in a court action November 2, 1944, in a case instituted by the O.P.A. Mr. Miller drew the will for Mrs. Torstensen, in which he was named executor to serve without bond. He and his wife were the only witnesses to the will. Miller also petitioned the court January 22, 1945, to have himself appointed guardian for the estate of Mrs. Torstensen. When appellant filed his petition contesting the will, Miller filed his appearance as counsel for himself as executor, "and Mabel Guss, the legatee and devisee under the will." Mr. Garland acted as cocounsel in all subsequent proceedings. Aside from testifying at length during the trial, Miller acted as trial attorney for himself as executor and Mabel Guss as legatee. During the progress of the trial, Miller examined seven witnesses who testified in support of the will and addressed objections and observations to the court on four occasions. We are not advised as to the activities of Miller in preparing the brief for respondents on appeal, but we do find his name on their brief as their attorney.
The case of Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676, involved a will contest in which the contestants claimed that the testator was mentally incompetent at the time he executed his will. The attorney who drew the will acted as counsel for the proponents of the will during the trial, and testified that, some time before his death, the testator in detail told of all his property, about his past life, and his children, stated what he wanted to do, and was possessed of sufficient mentality to understand his property and his relatives. The court, in speaking of the evidence given by the attorney and his actions as trial lawyer, stated:
"We are inclined to think the evidence properly received, but solely upon the ground that an attorney who drafts a will is presumed to impartially represent the estate and to *Page 864 
be without bias. This presumption may hardly be justified in relation to an issue as to testamentary capacity, as any attorney would naturally hesitate to admit that he had drawn a will for a testator whom he considered to be without testamentary capacity. In this case we find this witness not remaining neutral, but appearing in court upon the trial as one of the attorneys for the proponents of the will. Knowing, as he must, that he would be called as a witness to testify to matters going to the merits of at least one issue raised by contestants, he should, in conformity with the nineteenth Canon of Ethics adopted by the Bar Association of this state and the American Bar Association, have refused to act as attorney for appellants. His evidence is not entitled to that credence to which it would have been entitled if he had preserved that neutrality that a high sense of professional propriety would have demanded."
A will contest was involved in In re Stephens' Estate,207 Minn. 597, 293 N.W. 90. The grounds of objection to the will were lack of testamentary capacity and undue influence. A jury decided that the execution of the will had been brought about by undue influence. An attorney, W.L. Hursh, drew the will, and signed it as a witness. Hursh testified at the trial as an important witness for the proponents of the will, and actively participated in the trial of the cause, as well as on appeal. In passing upon the actions of the attorney, the supreme court of Minnesota had the following to say:
"What has been said disposes of the appeal on its merits. There is, however, another matter which we cannot overlook or refrain from discussing, much as we would like to avoid so doing. InFerraro v. Taylor, 197 Minn. 5, 12, 265 N.W. 829, 833, we said:
"`The practice of attorneys of furnishing from their own lips and on their own oaths the controlling testimony for their client, is one not to be condoned by judicial silence. * * * The good name and deservedly high standing of the Minnesota Bar require that the practice be stopped, for nothing short of actual corruption can more surely discredit the profession. * * * By appearing in the dual capacity of counsel and witness, and then necessarily by argument urging upon the judge, as trier of the facts, the truth of their own testimony, * * * counsel for plaintiff have subjected themselves to the results which automatically *Page 865 
attend such a spectacle, for a lawyer "occupying the attitude of both witness and attorney for his client, subjects his testimony to criticism if not suspicion." * * * "In most cases, counsel cannot testify for their clients without subjecting themselves to just reprehension."'"
Interior Woodwork Co. v. Buhler, 207 Wis. 1, 238 N.W. 822, involved, among other things, the evidence of an attorney who testified as a witness for a litigant and, at the same time, acted as trial attorney in the case. The court said:
"We must again condemn the impropriety of an attorney, who knows in advance of a trial that he is a necessary and material witness, and that he will be required to testify to contested facts, also attending and participating in the trial as an attorney for one of the contesting litigants. Harold Paul was the first witness called on behalf of plaintiffs, and then, and again on rebuttal, he testified to the most important contested matters on which plaintiffs relied. Nevertheless, he also, as attorney for plaintiffs, conducted all direct and cross-examinations of all other witnesses, and apparently participated in all arguments on the trial as well as in this court. His dual capacity in this litigation is clearly within the condemnation expressed in Roysv. First Nat. Bank, 183 Wis. 10, 20, 197 N.W. 237; Zeidler v.State, 189 Wis. 44, 48, 206 N.W. 872; Borger v. McKeith,198 Wis. 315, 319, 224 N.W. 102; Baumgartner v. State,198 Wis. 180, 186, 223 N.W. 419, 224 N.W. 474. The last two cases recognize that unanticipated situations may develop during the course of a trial because of which the interests of justice may demand that an attorney take the stand, but that, manifestly, did not occur in the case at bar. As stated in the cases cited, the practice offends against rule 19 of the Canons of Ethics of the American Bar Association, which states ethical considerations that must appeal to every lawyer as sound. Because of those considerations, under such circumstances as existed in the case at bar, an attorney should voluntarily retire from the conduct of litigation as soon as the incompatibility in roles becomes apparent, or else his client should forego having him testify as a witness in support of his client's cause."
Following this case we find In re Cieszynski's Will,207 Wis. 253, 241 N.W. 364, reads:
"The sole question upon this appeal is whether the findings *Page 866 
are sustained by the evidence, and it is the conclusion of the court that the judgment herein should be affirmed without opinion. This memorandum is filed solely for the purpose of calling attention to an impropriety upon the part of the attorney for the respondent. Mr. Adamkiewicz drafted the will in question, was an important witness upon the issue of undue influence, and must have anticipated in advance of the trial that his presence as a witness would be required. It appears from the record that he nevertheless appeared and conducted the litigation on behalf of the estate. In such a situation a lawyer should withdraw from the conduct of the litigation, or his clients should forego his testimony."
The supreme court of Illinois in McKey v. McKean, 384 Ill. 112, 51 N.E.2d 189, had this to say of a witness who acted as attorney:
"The course pursued by the attorney in this case would not properly subject him to criticism had the necessity of his going upon the witness stand resulted from some unforeseen event that occurred in the progress of the trial, but that was not so. He instituted the suit. He prepared the complaint. He conducted the case and the examination of witnesses before the master until shortly before he announced his withdrawal as an attorney. It must have been as apparent to him when he dictated the complaint that he believed his testimony would be material, as when he took the witness stand. Immediately upon that fact becoming evident, it was his duty to then determine whether or not he would be a witness in the cause, and if he was to testify, he should at that time have entirely severed his connection with the litigation. If the conclusion was that he should not testify, he and his client should have abided by that decision, unless some emergency thereafter arose which could not be anticipated, making it important for the protection of his client's interest that he should testify. (Onstott v. Edel, 232 Ill. 201.) This practice has been repeatedly condemned by this court. The testimony of an attorney in a case under such circumstances is entitled to little or no weight or credit."
Accord: Inman v. Inman, 158 Va. 597, 164 S.E. 383, Protheroev. Davies, 149 Kan. 720, 89 P.2d 890, Beninca v. Nardiello,320 Ill. 181, 150 N.E. 661, and Zeidler v. State, 189 Wis. 44,206 N.W. 872. *Page 867 
 [5] Mr. Miller was charged with the knowledge, at the time he drew the will and acted as a witness, that he might be called as a witness to substantiate the action of his client. When the contest was filed, he had actual knowledge that he would be an important witness in upholding the will, which, if upheld, would result in a very substantial fee for him. His testimony was of vital concern in the trial of the case. As we have stated, he had known the testatrix for many years; he had acted as her counsel for a long time; he had defended her when she was sued by the O.P.A.; he talked to her before the will was drawn concerning the disposition of her property; he drew the will, saw her sign it, and acted as a witness; but notwithstanding all these facts, counsel took an active part in the trial of the case and, as such, retains his position to this day. Of course, he performed his duty as an attorney when he drew the will, signed it as a witness, accepted the position of executor, and when he testified in court; but he violated the code of ethics of the bar of this state when he acted as attorney in the trial of the cause and in this court. Because of his activities in deliberately violating the ethics of his profession, we feel unable to give his evidence much credit.
It is true that Mrs. Miller witnessed the signing of the will, acted as one of the witnesses, and testified that she was of the opinion that Mrs. Torstensen was competent. However, the will was not read by Mrs. Torstensen, nor was it read to her, in the presence of the witness. Mrs. Miller had very little opportunity to measure the mental condition of the testatrix.
The evidence of the old neighbors, friends, and acquaintances of Mrs. Torstensen, was fairly balanced. Some told of queer behavior, and strange talk, and therefrom gained the impression that the testatrix was incompetent. Other people who had known her for an equal length of time were of the impression that she was perfectly sane.
[6] The evidence given by most of the doctors who testified in this case is helpful in arriving at a decision. The evidence of Dr. Harold Cornell cannot be given much *Page 868 
weight because he saw Mrs. Torstensen for but a few minutes and did not make a point of ascertaining her mental condition. The other doctors, as we have pointed out by quoting a considerable portion of their testimony, were clearly of the mind that Mrs. Torstensen was mentally incompetent to make a will on November 24, 1944, because she was affected with senile dementia.
The question of insanity must, in the main, be determined by men learned in the medical profession. The information from those individuals is obtained from the evidence given on the witness stand and from books written by them. Whether a person has senile dementia is a question of fact to be determined by the doctors. The question of the effect upon the mind of one so affected must be determined by the medical men.
[7] Senile dementia is due to senile degeneration. It is a form of dementia, or insanity occurring in old age, and characterized by hopeless decay, or loss, of the mental faculties. The symptoms of senile insanity are best understood by describing the conduct of persons who, beyond a reasonable doubt, are affected with that disease. Their conduct is so strange and so different from that of earlier years, and from that commonly observed in the generality of persons we meet on all occasions, that we conclude rightly that they are either demented or approaching that stage. Their peculiarities are exhibited in many ways, but there are two or three types that are most frequently met with. The patient becomes more and more forgetful, and it is increasingly difficult for him to remember names and events, especially those which are recent. If the patient with senile dementia has always been talkative, he will become more garrulous, and he will spend a great deal of time with anyone who is ready to listen patiently to his wearisome recital of the smallest details, concerning something which is of little, if any, importance to anyone. He may boast of his wealth and influence, or of his poverty and neglect. His wide range of perversity is dotted with fixed purposes. Some of the patients are very untidy. As the affection *Page 869 
progresses, the patient with senile dementia becomes suspicious of everybody, especially his kindest relative. In some cases he has delusions of persecution, and that all are scheming to waylay him and take his property from him. Much of his speech is incoherent, and he may repeat the same thing over and over to be sure that you get it. Other people suffering with this disease appear dejected and gloomy almost all of the time. Nervous and Mental Diseases, Malloy, p. 350.
The following excerpt on the subject of senile dementia is taken from Nervous and Mental Diseases, Church-Peterson, pp. 813 and 814:
"The earliest symptom is failure of memory. The most recent memories disappear first in a sort of chronological order. After a time the patient fails to recognize any of his surroundings or any of the people about him. He converses with those near him, and miscalls them, as if they were old friends of long years ago. He lives over old events as if they were now enacted. Later on even these old memories vanish also. With failing memory, the judgment-associations perish. The patient commits many breaches of decorum, and later, with the degeneration of ethical feelings and the ascendancy of coarser instincts, may become very negligent, indecent, and unclean in habits; may pilfer and destroy things; may expose his person, masturbate, or attempt liberties with little girls, etc. His loss of judgment may induce him to foolishly squander his money and properties.
"Illusions and hallucinations begin to manifest themselves. They are usually of terrifying character.
"Delusions make their appearance. These are nearly always persecutory in nature, and arise either as primary ideas or as the result of depression or on the basis of hallucinations. Next to delusions of persecution in frequency, we observe hypochondriacal delusions, with contents modified by the weak-mindedness present. Delusions of approaching poverty are quite common.
"The underlying mood is often melancholic; an exalted mood is extremely rare. Changeability with irritability is perhaps the most usual affective condition."
[8] The information above set out, which we have gleaned from medical authorities, coupled with the testimony *Page 870 
of the doctors who testified in this case, compel the conclusion that Mrs. Torstensen was mentally incompetent to make her will on November 24, 1944.
Three other matters connected with this case compel a holding that Mrs. Torstensen was incompetent when she made her will. The first was the testimony of Mr. Ralph Horr, an attorney who had practiced his profession for thirty-two years. Mr. Horr had drawn one will for Mrs. Torstensen when she had control of all her faculties, and then, just a short time before the will was drawn which is here contested, he had occasion to act on her behalf in the city of Bremerton and thereafter consulted with her in his Seattle office. His long period of service in his profession in which he had occasion to contact many people in all walks of life, and under usual and unusual conditions, enabled him to accurately ascertain the mental condition of the testatrix.
Honorable John M. Ralston, judge of the superior courts of Jefferson and Clallam counties, had a long and valuable experience as a lawyer and as a judge. We find him listed as a superior court judge for the first time in vol. 71 of the Washington reports. As a lawyer, he undoubtedly came in contact with many people and learned to know them, and measure their capabilities. Throughout the years as superior court judge, he has had many hundreds of people come into his courtroom and testify from the witness stand. This wealth of experience well equipped him to measure the mental condition of Mrs. Torstensen while she sat in the courtroom and testified from the witness stand.
Judge Ralston and Mr. Horr had an advantage denied to the learned trial court and the members of this court, in that they saw and heard Mrs. Torstensen under conditions which enabled them to measure her mental condition, and ascertain whether or not she had the ability to make a will.
The third deciding factor is the evidence given by Mrs. Torstensen in the O.P.A. case, most of which is included in the questions asked of Mr. Miller on cross-examination, and all of which is contained in plaintiff's exhibit "J" in *Page 871 
this case. Her testimony was rambling, inconsistent, and disjointed. It was in keeping with her conversations with appellant's witnesses, and demonstrated her mental incapacity to make a will.
Respondents lay great stress upon the appellant's letter written February 8, 1922. They argue that it caused the testatrix to dislike her son, and for that reason she disinherited him. The argument has force. However, it loses its convincing effect when we call to mind that the will drawn by Mr. Horr in 1942, and executed by the testatrix, divided the property equally between the two children, appellant in this case, and his sister, Mrs. Guss. Another factor is that Mrs. Torstensen on two or three occasions indicated a continuing regard for her son.
It is argued that the evidence given by Mrs. Torstensen at the O.P.A. trial was for the purpose of convincing the trial judge that she had very little property, and did not understand the rules in regard to rentals. This idea springs from the evidence given by Mr. Miller as to what he thought she was trying to do. Mr. Miller's idea, or conclusion, as to what Mrs. Torstensen was attempting to do is not material. The testimony she gave spoke for itself.
Judgment reversed.
MALLERY, C.J., STEINERT, JEFFERS, ABEL, and HILL, JJ., concur.